## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| CARMAX AUTO SUPERSTORES, INC., | § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. _____ |
| v. | § § | |
| DRIVETIME CAR SALES, INC., | § § § | |
| Defendant. | | |

### PLAINTIFFS' ORIGINAL COMPLAINT – CIVIL RICO

Plaintiff CarMax Auto Superstores, Inc. ("CarMax") complains of Defendant DriveTime Car Sales, Inc. ("DriveTime") and shows as follows:

### I.
### JURISDICTION AND VENUE

1.      This is a federal question and civil RICO case.  This Court has jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

2.      Because there is complete diversity between the parties on CarMax's state law claims, this Court has jurisdiction over those claims under 28 U.S.C. § 1332(a).

3.      This Court also has supplemental jurisdiction over CarMax's state law claims under 28 U.S.C. § 1367 as these claims are inextricably related to CarMax's RICO claim and form part of the same case or controversy.

4.      Venue is proper in the Eastern District of Texas pursuant to 18 U.S.C. § 1965(a) because DriveTime resides, may be found, has agents, and transacts its affairs in the Eastern District of Texas.  Venue is also proper under 28 U.S.C. § 1391(b) because

701499936v1

DriveTime is a corporation residing in the Eastern District of Texas.   DriveTime operates two stores in the Eastern District of Texas.   In addition, DriveTime and its co-conspirators, named and unnamed, have performed acts in furtherance of the conspiracy in this district.

## II.
### SUMMARY OF COMPLAINT

5.      DriveTime has engaged in an illicit scheme to steal business from CarMax by bribing CarMax sales employees ("Sales Consultants") to divert sales from CarMax to DriveTime and misappropriate CarMax's confidential information by providing that information to DriveTime.   DriveTime's illicit conduct spans numerous states, likely all states in which DriveTime operates, and depends on the use of deception and secrecy.

6.      In particular, using a variety of deceptive artifices (for example, by posing as customers), DriveTime recruits CarMax Sales Consultants into the bribery scheme. Corrupted CarMax Sales Consultants then secretly refer CarMax customers to DriveTime.   If DriveTime completes a sale to a diverted customer, the CarMax Sales Consultant responsible receives a payment of usually $300 to $500.   At DriveTime's request, corrupted CarMax Sales Consultants also provide DriveTime with confidential CarMax customer information, such as vehicle preferences and the down payments diverted customers can make.   Access to this information makes it easier for DriveTime to complete sales to the diverted customers.   DriveTime has engaged in a concerted effort to hide its activities from CarMax by secretly recruiting CarMax employees, training its employees to misrepresent themselves (as customers, insurance agents, etc.),

and instructing CarMax employees to avoid using CarMax phones and e-mail accounts to communicate with DriveTime to avoid detection.

7.      DriveTime's conduct constitutes commercial bribery and violates the federal Racketeering Influenced and Corrupt Organizations Act ("RICO") as well as state laws prohibiting unfair competition, tortious interference with prospective business relations, and misappropriation of trade secrets.

### III.
### PARTIES AND SERVICE

8.      Plaintiff CarMax Auto Superstores, Inc. is a Virginia corporation with its principal place of business in Goochland County, Virginia.  CarMax Auto Superstores, Inc. owns and operates, both directly and through subsidiaries, used car superstores across the country.

9.      Defendant DriveTime Car Sales, Inc. is an Arizona corporation with its principal place of business in Phoenix, Arizona.  DriveTime Car Sales, Inc. is wholly owned by DriveTime Sales and Finance Corporation.  On information and belief, DriveTime Car Sales Inc. operates DriveTime's stores, including DriveTime's Texas stores.

10.     DriveTime Car Sales, Inc. may be served with process through its registered agent:  CT Corporation System, 350 N. St. Paul St., Dallas, Texas 75201.

11.     Various persons and entities whose identities are unknown to CarMax at this time participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

12.     The acts charged in the Complaint have been done by DriveTime and its co-conspirators or were authorized, ordered, or done by DriveTime's respective officers, agents, employees, or representatives while actively engaged in the management of DriveTime's business or affairs.

## IV.
### FACTS

**A.     Overview of DriveTime's Bribery Scheme**

13.     DriveTime has engaged in a concerted, multi-state scheme to bribe and corrupt CarMax's Sales Consultants (the "bribery scheme").  DriveTime secretly recruits CarMax Sales Consultants into DriveTime's referral program and typically has each participant execute Internal Revenue Service ("IRS") paperwork to facilitate payment. When a customer visits CarMax in person or submits information on the internet for the purposes of purchasing a car from CarMax (commonly known as a "web lead"), the corrupted CarMax Sales Consultant will refer the customer to DriveTime by sending the customer directly to DriveTime, providing the customer's confidential information to DriveTime, or both.  If the customer then completes a purchase from DriveTime, DriveTime pays the referring CarMax Sales Consultant a kickback, or "referral fee," that has varied over time and currently ranges from $300 to $500.  DriveTime usually makes the referral fee payments by way of a debit card that is issued to a Sales Consultant following the first successful referral and later loaded with subsequent referral fees. The payment is made by DriveTime Sales and Finance Corporation and/or DT Acceptance Corporation.  DriveTime has engaged in an extensive and concerted effort

to prevent CarMax from discovering its activities and the extent to which it has corrupted CarMax's sales staff.  DriveTime has engaged in this pattern of bribery in at least Texas, California, Florida, Georgia, Nevada, North Carolina, and Virginia.  Upon information and belief, DriveTime directs the bribery scheme from its headquarters in Arizona.

**B.     DriveTime's Fraudulent Scheme to Recruit CarMax's Sales Consultants**

14.     Knowing that its conduct is wrongful and prohibited, Drive Time has resorted to fraudulent artifices and aggressive tactics to recruit CarMax's Sales Consultants for the bribery scheme.

15.     DriveTime recruiters have frequently visited and called CarMax stores posing as potential customers to avoid detection by CarMax management.   The recruiters have misrepresented their true purposes until they were able to get a Sales Consultant alone on the lot, on the phone, in the restroom, or on a test drive and only then revealed their identities as DriveTime employees and solicited the Sales Consultants to send referrals.  For example:

a.   In late 2003 two unidentified DriveTime employees visited the CarMax San Antonio store, stated they were looking for a car, and were escorted to the lot by a CarMax Sales Consultant ("SC1").  Once they were out on the lot, the individuals stated they were with DriveTime and offered that DriveTime would pay SC1 a fee if he referred customers to DriveTime.

b.   In or around March 2009 an unidentified DriveTime employee called the CarMax San Antonio (Texas) store posing as a customer and asked for a

particular Sales Consultant ("SC2").  When SC2 returned the call, the DriveTime employee identified himself and attempted to solicit referrals.

c.   In April 2008 two DriveTime employees ("DT1" and "DT2") visited the CarMax San Antonio store posing as customers, approached a CarMax Sales Consultant ("SC3") in the ladies restroom, and offered SC3 $300 for customer referrals.

d.   As reported by a Sales Consultant in the CarMax Jacksonville (Florida) store ("SC4"), on multiple occasions over the last several years DriveTime employees visited the store, stated they were interested in purchasing a vehicle, and went out on test drives with CarMax Sales Consultants.  Once out on the test drives, the individuals stated they were with DriveTime and solicited referrals.

16.   Another deceptive tactic that DriveTime recruiters have employed is to pay CarMax Sales Consultants even before those Sales Consultants send any referrals. DriveTime recruiters have called Sales Consultants and informed them that checks were waiting for them at DriveTime if they would only come to the store and complete some paperwork.  The paperwork is the IRS form, and once the Sales Consultants executed it, they were enrolled in the program and on the DriveTime payroll.

17.   DriveTime recruiters have also frequently obtained the private cell phone numbers of CarMax Sales Consultants and solicited referrals by calling those numbers. For example:

    a.   In or around March 2008 an unidentified DriveTime employee called the personal cell phone of a Sales Consultant from the CarMax Plano (Texas) store ("SC5") and offered that DriveTime would pay SC5 a substantial stipend if he referred customers to DriveTime.

    b.   In approximately January 2009 an unidentified DriveTime employee called the personal cell phone of a Sales Consultant from the CarMax Jacksonville store ("SC6") and solicited referrals.

    c.   In 2009 and possibly earlier DriveTime repeatedly called the personal cell phone of a Sales Consultant in CarMax's Charlotte (North Carolina) store ("SC7") to solicit customer referrals.

18.    DriveTime has also offered to pay CarMax Sales Consultants that it has already corrupted to recruit more CarMax Sales Consultants into the DriveTime bribery scheme from inside CarMax.  For example, in 2008 a DriveTime representative offered a Sales Consultant in CarMax's Charlotte store ("SC8") $50 for each CarMax employee he could recruit for the bribery scheme.

19.    DriveTime has also frequently used former CarMax employees, who know firsthand that CarMax explicitly prohibits referrals and kickbacks, to recruit CarMax Sales Consultants into the bribery scheme.  These former CarMax employees who have gone to work for DriveTime, acting at the request of DriveTime management, use their contacts and knowledge of CarMax's processes to solicit referrals.  For example:

701499936v1

a. A CarMax Buyer ("DT3") who left CarMax's Ontario (California) store for a Sales Manager position at DriveTime, began recruiting CarMax Sales Consultants for referrals in 2007.

b. A CarMax Sales Manager ("DT4") who left CarMax's Charlotte (North Carolina) store for a Sales Manager position at DriveTime, began recruiting CarMax Sales Consultants for referrals in 2006.

c. Upon information and belief, two CarMax Sales Consultants who left CarMax's Southlake (Atlanta, Georgia) store for positions at DriveTime ("DT5" and "DT6"), began recruiting CarMax Sales Consultants for referrals in 2006.

20. DriveTime's recruiting program is orchestrated from the highest levels of the company. DriveTime's President and CEO has specifically directed DriveTime employees to recruit CarMax Sales Consultants into the bribery scheme.

**C. DriveTime's "Referral Fees" are Bribes to Induce CarMax's Sale Consultants to Breach Their Fiduciary Duties to CarMax and to Deprive CarMax of the Honest Service of Its Employees**

21. CarMax Sales Consultants owe CarMax a fiduciary duty to protect the company's assets and not to divide their loyalty between CarMax and its competitors, such as DriveTime.

22. CarMax invests substantial resources developing and courting its customers, generating customer traffic in its stores, protecting the confidentiality of any information collected about customers, and training its Sales Consultants.

701499936v1

23.     The customer information that CarMax collects and protects, from the customers' names to their vehicle interests to their creditworthiness to the fact that they are in the market for a car, are all confidential company assets.

24.     DriveTime's referral payments induce CarMax Sales Consultants to breach their fiduciary duties to CarMax and deprive CarMax of their honest services.

25.     DriveTime has induced CarMax Sales Consultants to breach their fiduciary duties to CarMax by referring customers to DriveTime who would otherwise have purchased a car from CarMax.

26.     DriveTime has also induced CarMax Sales Consultants to breach their fiduciary duties to CarMax by referring "web leads."  Web leads are customers fed to CarMax (for a fee) from online car and financing sites.  A Sales Consultant in CarMax's Jacksonville store ("SC9") and likely others have sent these web leads directly to DriveTime without ever contacting the customers to attempt to sell them CarMax cars. Indeed, SC9 estimates that 20% of the 250 referrals he sent between October 2008 and March 2009 were web leads.  These diverted web leads represent lost CarMax business.

27.     DriveTime has also induced CarMax Sales Consultants to breach their fiduciary duties to CarMax by providing DriveTime confidential and proprietary information.

28.     When referring customers to DriveTime, Sales Consultants almost always provide customer names and phone numbers and, implicitly, information regarding the customer's purchasing behavior (*e.g.*, that the customer is in the market for a used vehicle and has shopped at CarMax).

29.     DriveTime routinely requests, receives, and pays for much more information than names and phone numbers.  For example:

    a.  A Sales Consultant in CarMax's Jacksonville (Florida) store ("SC9") sent DriveTime spreadsheets of referrals that included the customers' down payments and provided additional information relating to customers' financial wherewithal.

    b.  A Sales Consultant in CarMax's Ontario store ("SC10") receives routine requests from DriveTime to provide and does provide information regarding how much a customer can put toward a downpayment and whether the customer has a co-signer and/or certain stipulations regularly required by lenders (*e.g.*, paystubs as evidence of income).

30.     Because CarMax invests substantial resources in the training and development of its employees and has a right to the honest services of those employees, attracting customers to its stores, and developing and protecting the confidentiality of any information collected about customers, CarMax is harmed by each and every customer referral in addition to the volume of sales lost to DriveTime.

31.     On several occasions of which CarMax is aware, DriveTime has also attempted to obtain additional confidential CarMax information regarding CarMax's business.  For example, DriveTime employees in California and San Antonio have inquired into how many vehicles their respective CarMax stores sell per month.

701499936v1

**D.    DriveTime Uses the Mails, Wire Communications, and Financial Institutions to Effectuate Payment of the Bribes**

32.    DriveTime relies on the mails, wire communications, and financial institutions to effectuate its bribery scheme.

33.    To enroll in the bribery scheme, a CarMax Sales Consultant is required to complete IRS paperwork, and an IRS Form 1099 is then filed with the IRS either electronically or by mail and mailed to the Sales Consultant.

34.    To make the actual referral fee payment, DriveTime typically issues a debit card provided by Comdata and issued by Regions Bank.  The debit card is usually mailed to the Sales Consultant and is debited with additional funds after each successful referral.

35.    DriveTime and the CarMax Sales Consultants communicate by both telephone and e-mail.   In fact, DriveTime specifically instructs CarMax Sales Consultants not to use CarMax telephone lines or e-mail accounts so as to avoid detection, though they occasionally do so.  CarMax has already obtained phone records reflecting calls from Sales Consultants to DriveTime in Texas, California, North Carolina, Florida, and Virginia.

**E.    DriveTime's Scheme to Corrupt CarMax's Employees Involves Activity Spanning Several States, Numerous CarMax Employees, and Thousands of Dollars in Bribes**

36.    DriveTime has attempted to secretly recruit CarMax Sales Consultants for its bribery scheme in at least seven states and likely in all ten states in which DriveTime operates.  Its recruiting efforts have been successful in at least five states.

37.     In Texas, at least two CarMax Sales Consultants have referred CarMax customers to DriveTime, and many more have been recruited:

    a.  A Sales Consultant in CarMax's San Antonio store ("SC2") has referred at least one customer to DriveTime since 2008 and has received at least $300 in referral fee payments.  His primary referral contact works or worked at the San Antonio DriveTime ("DT7").

    b.  Another Sales Consultant in CarMax's San Antonio store ("SC11"), has referred at least one customer to DriveTime since 2008 and has received at least $250 in referral fee payments.

    c.  At least 12 other CarMax Sales Consultants have been recruited by DriveTime for referrals in Texas, including at least seven in CarMax's Plano store and five in CarMax's San Antonio store.

38.     In Florida, at least two CarMax Sales Consultants have referred CarMax customers to DriveTime, and many more have been recruited:

    a.  A Sales Consultant in CarMax's Jacksonville store ("SC9") has referred approximately 250 CarMax customers to DriveTime since October 2008 and has received approximately $2000 in referral fee payments, including $1200 reflected on a 2008 1099.  His primary referral contacts are a Sales Associate ("DT8"), a Sales Manager ("DT9") at the Jacksonville DriveTime.   He has also attempted to recruit other CarMax Sales Consultants into the program.

b.  Another Sales Consultant in CarMax's Jacksonville store ("SC12") has referred at least fifteen CarMax customers to DriveTime and has received at least $900 in referral fee payments, as reflected on a 2008 1099.  His primary referral contact is a different Sales Associate at the Jacksonville DriveTime ("DT10").  He has also attempted to recruit other CarMax Sales Consultants into the program.

c.  At least ten other CarMax Sales Consultants have been recruited by DriveTime for referrals in Florida, including at least four in the Clearwater store in 2005 and four in the Jacksonville store.

39.    In California, at least two CarMax Sales Consultants have referred CarMax customers to DriveTime:

a.  A Sales Consultant in CarMax's Ontario store ("SC10") has referred approximately 150 CarMax customers to DriveTime since 2007 and has received approximately $6000 in referral fee payments, including $3,300 reflected on a 2008 Form 1099.  His primary contact at DriveTime is a Sales Associate at the Montclair, California DriveTime ("DT11").   He was recruited by DT3, a DriveTime Sales Manager and former CarMax employee.

b.  Another Sales Consultant in CarMax's Ontario store ("SC13"), has referred at least one CarMax customer to DriveTime and has received referral fee payments.  His primary contact at DriveTime is also DT11.

40.     In North Carolina, at least three CarMax Sales Consultants have referred CarMax customers to DriveTime, and many more have been recruited:

a.  A Sales Consultant in CarMax's Charlotte store ("SC7") has referred at least four CarMax customers to DriveTime since 2008 and has received approximately $1,400 in referral fee payments.   His primary referral contact is a man at the Charlotte DriveTime ("DT12").

b.  Another Sales Consultant in CarMax's Charlotte store ("SC8") has referred at least five CarMax customers to DriveTime since the summer of 2008 and has received at least $1,500 in referral fee payments.   His primary referral contacts are two men at the Charlotte DriveTime ("DT13" and "DT14").   DriveTime has offered SC8 $50 for each other CarMax Sales Consultant he recruits into the program.   DriveTime has also suggested that SC8 could organize other Sales Consultants and receive and distribute referral fee payments for their referrals.   DriveTime has also offered to pay SC8 in cash if he were to grow overly concerned about detection by CarMax.

c.  A Sales Consultant in CarMax's Fayetteville store ("SC14"), has also referred CarMax customers to DriveTime.

d.  At least three other CarMax Sales Consultants have been recruited by DriveTime for referrals in North Carolina.

41.     In Georgia, a Sales Consultant in CarMax's Southlake store ("SC15"), referred at least four CarMax customers to DriveTime in or before 2006.  Her primary contact was a man at the Atlanta DriveTime ("DT15").

42.     DriveTime has also recruited CarMax Sales Consultants to provide referrals in Nevada in 2006 and in Virginia in 2007.

43.     Upon information and belief, numerous additional current and past CarMax employees in Texas, California, Florida, North Carolina, Georgia, Nevada, Virginia, Arizona, New Mexico, and Colorado have been recruited for and/or have participated in the DriveTime bribery scheme.

44.     Upon information and belief, CarMax estimates that its damages, comprised of lost profits, misappropriated property, and devalued investments exceed $75,000.

**G.     DriveTime Specifically Trains its Employees to Misrepresent Themselves and Employ Deceptive Tactics to Conceal Their Misconduct When Recruiting Referrals**

45.     DriveTime has taken extensive precautions to maintain the secrecy of its efforts to recruit CarMax Sales Consultants into the bribery scheme and to hide its activities from CarMax.

46.     DriveTime specifically trains its employees to misrepresent themselves and employ deceptive tactics when recruiting referrals.

47.     A former CarMax Sales Manager who was hired to be a DriveTime Sales Consultant ("DT16") participated in a four-week training course that addressed recruiting strategies and practices.   The training was conducted at DriveTime's

Lewisville, Texas location in December 2008 and January 2009.  The training included the following instructions:

    a.  DT16 was instructed to claim to be a customer or insurance agent when calling to solicit referrals in order to avoid detection by store management.

    b.  DT16 was instructed not to use DriveTime phones when calling to solicit referrals in order to avoid being identified through caller ID as a DriveTime employee.

    c.  DT16 was instructed to obtain from a customer's credit report other dealers who had run a credit report on the customer, to contact the dealers and claim to have a referral fee for them, and to use that fee as bait to lure the dealers into the referral program.

    d.  DT16 was instructed how to obtain Sales Consultants personal cell phone numbers so that they could be contacted and recruited directly without detection by store management.  DT16 was instructed that DriveTime Sales Associates were required by management to devote specific and significant time each week to solicit referrals.

48.    Numerous DriveTime employees, including DT3, DT4, DT8, and DT9, have instructed numerous CarMax Sales Consultants, including SC7, SC9 and SC10, not to use CarMax telephones or e-mail accounts to communicate regarding referrals and to keep the referrals secret.

49.    In CarMax's Charlotte store, after a customer complained about being referred to DriveTime without his consent by SC7, DriveTime offered to pay a different

701499936v1

CarMax Sales Consultant ("SC8") in cash if that would ease his concerns about being detected.

50.     After receiving word that CarMax was investigating referrals to DriveTime, DriveTime (through DT8 and DT10) made payments to SC9 and SC12 unrelated to any referrals.  Upon information and belief, the purpose of these payments was to induce those individuals to continue participating in the bribery scheme despite their fear of detection.

**V.**
**CAUSES OF ACTION**

**A.     RICO**

1.     *Substantive statutory violations*

51.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

52.     DriveTime has violated 18 U.S.C. § 1962(a).  DriveTime has received income, directly and indirectly, from a pattern of racketeering activity in the form of profits from sales diverted from CarMax and the use of CarMax's confidential customer information.  DriveTime has participated as a principal in this pattern of racketeering activity.  In fact, it has directed the bribery scheme.  DriveTime has used and invested, directly and indirectly, the income and proceeds of its racketeering activity in the operation of an enterprise engaged in and affecting interstate commerce through wrongfully acquired sales and by compensating the corrupted CarMax employees.

53.     DriveTime has violated 18 U.S.C. § 1962(b).  Through a practice of racketeering activity, DriveTime has acquired and maintained, directly and indirectly,

an interest in and control of an enterprise engaged in and affecting interstate commerce. DriveTime has maintained control of its illicit bribery scheme through a pattern of bribery and fraud.

54.     DriveTime has violated 18 U.S.C. § 1962(c).  DriveTime is associated with an enterprise engaged in and affecting interstate commerce.  DriveTime has conducted and participated in the affairs of that enterprise through a pattern of racketeering activity.  DriveTime has associated with the DriveTime managers and employees responsible for directing and overseeing the illicit referral scheme and the corrupted CarMax employees to engage in a pattern of commercial bribery and fraud.

55.     DriveTime has violated 18 U.S.C. § 1962(d).  DriveTime has conspired with CarMax's Sales Consultants to violate the provisions of 28 U.S.C. § 1962(a), (b), and (c).

2.     *Acts of racketeering*

56.     Within the past ten years, DriveTime has engaged in more than two acts of bribery that would be chargeable under Texas Penal Code § 32.43 (commercial bribery) and punishable by imprisonment for more than one year.  DriveTime has also engaged in more than two violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (travel in aid of racketeering).  Upon information and belief, DriveTime has also engaged in more than two violations of 18 U.S.C. §§ 1956 and 1957 (money laundering).  These crimes are predicate acts under 18 U.S.C. § 1961(1).

a.      Commercial bribery under Texas law

57.     DriveTime violated Texas Penal Code § 32.43 by knowingly and intentionally offering, conferring, and agreeing to confer a benefit on CarMax's employees in order to influence the conduct of CarMax's employees in relation to CarMax's affairs.  DriveTime paid CarMax employees kickbacks or "referral fees" to induce them to divert sales to DriveTime, to send DriveTime confidential customer information, and to hide the employees' participation in the bribery scheme from CarMax.

58.     DriveTime knew that CarMax had not consented to its employees' acceptance of the referral fees, that the individuals DriveTime bribed were employees of CarMax, and that the referral fees DriveTime offered would influence the employees' conduct of CarMax's affairs.   In fact, DriveTime has specifically targeted CarMax employees, even though CarMax has informed DriveTime that CarMax employees may not refer customers.  DriveTime has also made a concerted effort to prevent CarMax from discovering DriveTime's recruiting and referral activities.

b.      Federal mail and wire fraud

59.     DriveTime violated 18 U.S.C. §§ 1341 and 1343 by knowingly and intentionally devising a scheme or artifice to deprive CarMax of the honest service of its employees.  CarMax's Sales Consultants owed their employer a fiduciary duty under state law, and their breach of that duty harmed CarMax.  DriveTime paid CarMax employees kickbacks or "referral fees" to induce them to divert sales to DriveTime, to

send DriveTime confidential customer information, and to hide the employees' participation in the bribery scheme from CarMax.

60.     DriveTime knowingly and intentionally used the mail, wire, and radio facilities of the United States to execute this scheme or artifice.  DriveTime recruited CarMax Sales Consultants using the phones, required CarMax Sales Consultants to fill out IRS paperwork to participate in the referral scheme, sent IRS Form 1099s to the Sales Consultants by mail, and paid the CarMax Sales Consultants using debit cards, such payment being transmitted by wire.

> c.     Interstate travel in aid of racketeering

61.     DriveTime violated 18 U.S.C. § 1952 by travelling and using the mails and facilities of interstate commerce with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of its unlawful activities.  DriveTime recruited CarMax Sales Consultants using the phones and, upon information and belief, on roads used in interstate commerce.  These acts were done to promote, manage, establish, carry on, and facilitate bribery and attempted bribery in violation of the criminal laws of Texas, California, North Carolina, Nevada, and Arizona.

62.     DriveTime thereafter distributed the proceeds of its unlawful activities and promoted, managed, established, carried on, and facilitated its unlawful activities. DriveTime required CarMax Sales Consultants to fill out IRS paperwork to participate in the referral scheme, sent IRS Form 1099s to the Sales Consultants by mail and paid the CarMax Sales Consultants using debit cards.   These payments were made to

distribute the proceeds of the bribery scheme and to promote, manage, establish, carry on, and facilitate bribery and attempted bribery in violation of the criminal laws of Texas, California, North Carolina, Nevada and Arizona.

        d.     Money laundering

63.     Upon information and belief, DriveTime violated 18 U.S.C. § 1956 by knowingly and intentionally conducting a financial transaction involving proceeds DriveTime knew arose from unlawful activities with the intent to promote or further those illegal activities.  Upon information and belief, DriveTime violated 18 U.S.C. § 1957 by intentionally and knowingly engaging in a monetary transaction in excess of $10,000 when DriveTime knew those funds were derived from unlawful activity. Because DriveTime only pays referral fees if it consummates a sale, CarMax believes that DriveTime has compensated its co-conspirators for their participation in the conspiracy using funds from the sales CarMax's corrupted employees diverted to DriveTime.

        *3.*     *Pattern of racketeering activity*

64.     DriveTime's predicate acts are related and pose a threat of continuing racketeering activity.  DriveTime has bribed several CarMax employees in at least five states and has attempted bribery in at least two more states over a substantial period of time, diverting numerous sales from CarMax to DriveTime, and paying thousands of dollars in bribes.  DriveTime has also taken extensive steps to prevent CarMax from detecting its illicit activity.

65.   DriveTime's bribery scheme was directed at a common purpose, namely diverting sales from CarMax to DriveTime and obtaining confidential customer information from CarMax.   Bribes were paid regularly to several CarMax employees over at least several years.

66.   DriveTime's predicate acts are also part of its regular way of doing business.   DriveTime managers and employees in multiple states are aware that CarMax employees are not permitted to make referrals, but have continued to solicit referrals from CarMax employees in those states.

### 4.   RICO enterprise

67.   DriveTime is a RICO enterprise.   DriveTime operates throughout the United States and its pattern of racketeering activity has stretched across at least eight states.   DriveTime is engaged in and affects interstate commerce.

68.   Alternatively (exclusively for CarMax's claims under 18 U.S.C. § 1962(c)), DriveTime, the individual managers and employees of DriveTime that directed and participated in the bribery scheme, and the employees of CarMax that accepted bribes from DriveTime or otherwise participated in the bribery scheme, constitute a RICO enterprise.   DriveTime operates throughout the United States, and the CarMax employees it bribed or attempted to bribe are located in at least seven states.   This enterprise was engaged in and affects interstate commerce.

### 5.   Injury

69.   As a proximate result of DriveTime's racketeering activities, CarMax has lost profits on sales from the customers the corrupted CarMax employees diverted to

DriveTime.  CarMax's ability to compete has also been harmed by the misappropriation of its confidential customer and company information.  The DriveTime bribery scheme has also co-opted CarMax employees, depriving CarMax of the honest and undivided loyalty of its employees to CarMax's detriment.  The bribes paid to CarMax's employees also constitute a RICO injury.

**B.     California Unfair Competition**

70.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

71.     DriveTime has committed business acts and practices that are unlawful, unfair, or fraudulent in violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*  DriveTime is a person within the meaning of California Business & Professions Code § 17201.

72.     DriveTime's business acts and practices are unlawful and violate the UCL because DriveTime tortiously interfered with CarMax's prospective business relationships, misappropriated CarMax's trade secrets and confidential and proprietary information, and induced CarMax's employees to breach their fiduciary duties to CarMax.  In addition, DriveTime's business acts and practices violate California law including, without limitation, California Penal Code § 641.3 (commercial bribery).

73.     CarMax has suffered injury in fact and has lost money or property as a direct and proximate result of such unfair and unlawful business practices.

74.     DriveTime's conduct has caused and will continue to cause great irreparable harm to CarMax, unless and until it is enjoined by this Court.  CarMax has

no adequate remedy at law.  CarMax is entitled to an injunction restraining DriveTime, as well as its officers, agents, and employees, and all persons acting in concert with them, from engaging in the unfair and unlawful business acts and practices described herein.

75.     CarMax seeks an injunction under California Business & Professional Code § 17203 because DriveTime "engaged, has engaged, or proposes to engage in unfair competition" with CarMax.  Specifically, CarMax seeks an injunction requiring DriveTime to cease its wrongful conduct, as alleged above.

76.     In addition, as a proximate result of DriveTime's wrongful acts of unfair competition, DriveTime has obtained benefits and advantages that include misappropriated property, monetary profits, revenues and returns for DriveTime, in an amount to be proven at trial.  In fairness and equity, DriveTime should not be allowed to retain any such improperly obtained profits, revenues, or returns.  CarMax seeks restitution and disgorgement of all money or property wrongfully obtained or retained by DriveTime as a result of its unfair and unlawful business practices.

C.     **Florida Unfair Competition**

77.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

78.     DriveTime has engaged in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive practices in the conduct of its business in violation of Florida Statutes § 501.204.

79.     DriveTime's business acts and practices are unlawful and violate § 501.204 because DriveTime tortiously interfered with CarMax's prospective business relationships, converted CarMax's trade secrets and confidential and proprietary information, and induced CarMax's employees to breach their fiduciary duties to CarMax.   DriveTime's scheme to bribe CarMax's employees to divert sales to DriveTime and to misappropriate CarMax's trade secrets for DriveTime's benefit offends established public policy, is immoral, unethical, oppressive, and unscrupulous.

80.     CarMax has been injured as a result of DriveTime's unfair methods of competition, unconscionable acts and practices, and unfair and deceptive practices.

**D.     North Carolina Unfair Competition**

81.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

82.     DriveTime has engaged in unfair methods of competition in and affecting commerce in violation of North Carolina General Statutes § 75-1.1.

83.     DriveTime's business acts and practices are unlawful and violate § 75-1.1 because DriveTime tortiously interfered with CarMax's prospective business relationships, converted CarMax's trade secrets and confidential and proprietary information, and induced CarMax's employees to breach their fiduciary duties to CarMax.   DriveTime's conduct also violates North Carolina law, including, without limitation, North Carolina General Statutes § 14-353 (commercial bribery).

84.     CarMax's business has been injured by reason of DriveTime's unfair methods of competition.

701499936v1

**E.**     **Texas Unfair Competition**

85.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

86.     CarMax's has a right to conduct its business free of unlawful interference and competition from DriveTime.  DriveTime has employed criminal means to divert sales from and misappropriate the trade secrets of CarMax, its competitor.  DriveTime's conduct is prohibited by law, unreasonably interferes with CarMax's right to conduct its business, diverts customers from CarMax, and otherwise injures CarMax in its business and affairs.

**F.**     **Virginia Civil Conspiracy**

87.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

88.     DriveTime, its employees and managers, and the corrupted CarMax employees who participated in DriveTime's bribery scheme have combined, associated, agreed, mutually undertaken, and concerted together for the purpose of willfully and maliciously injuring CarMax in its trade and business in violation of Virginia Code § 18.2-499.

89.     CarMax has been injured in its trade and business by reason of DriveTime's violation of § 18.2-499.

**G.**     **Tortious Interference with Prospective Business Relations**

90.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

701499936v1

91.     DriveTime's conduct constituted tortious interference with prospective business relations in each state in which conduct was undertaken in furtherance of the bribery scheme.  There was a reasonable probability that CarMax would have entered into a business relationship with the customers its corrupted employees diverted to DriveTime.  DriveTime intentionally interfered with these relationships by bribing CarMax's employees so that they would divert sales and redirect customers to DriveTime.  DriveTime accomplished this interference by bribing CarMax's employees in violation of Texas Penal Code § 32.43 and the other laws invoked herein. DriveTime's interference proximately caused CarMax damages.

**H.     Trade-Secret Misappropriation**

92.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

93.     DriveTime's conduct constituted misappropriation of trade secrets in each state in which conduct was undertaken in furtherance of the bribery scheme.  CarMax's customer lists and information are trade secrets.   Information regarding CarMax's customer traffic, sales volume, and any efforts and ability to obtain financing for its customers also constitute trade secrets.  This information is not generally known or readily available from public sources, CarMax uses this information in its business, gains a competitive advantage from this information, and keeps it secret.  DriveTime knew or had reason to know that CarMax's Sales Consultants had a duty to keep this information confidential.

701499936v1

94.     DriveTime used CarMax's trade secrets after it improperly acquired those trade secrets by bribing CarMax's employees.   CarMax suffered injury as a result of DriveTime's illicit conduct.

## I.     Inducing Breach of Fiduciary Duty

95.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

96.     DriveTime induced CarMax's employees to breach their fiduciary duty to CarMax in each state in which conduct was undertaken in furtherance of the bribery scheme.   CarMax's employees owed CarMax a fiduciary duty.   CarMax's employees breached their fiduciary duty to CarMax by diverting sales to DriveTime, sending DriveTime confidential customer information, and hiding their participation in the bribery scheme from CarMax.   These breaches resulted in injury to CarMax through lost sales and benefit to the breaching employees in the form of referral fees.   DriveTime knew that CarMax's employees owed CarMax a fiduciary duty and knowingly participated in, encouraged, and induced their breach of that duty.

## J.     Unjust Enrichment

97.     CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

98.     DriveTime has obtained a benefit from CarMax by fraud and the taking of undue advantage in each state in which conduct was undertaken in furtherance of the bribery scheme.   DriveTime has diverted sales from CarMax and obtained CarMax's confidential information by bribing DriveTime's employees.   Permitting DriveTime to

retain the benefits and profits from its illegal scheme would be unjust and unconscionable.

### K.    Injunctive Relief

99.    CarMax re-alleges each and every allegation set forth in the preceding paragraphs and incorporates them herein by reference.

100.    DriveTime has employed criminal means to divert sales from and misappropriate the trade secrets of CarMax, its competitor.  DriveTime's conduct is prohibited by law, unreasonably interferes with CarMax's right to conduct its business, diverts customers from CarMax, and otherwise injures CarMax in its business and affairs.  The full extent of CarMax's damages cannot be remedied by monetary relief, and CarMax will suffer irreparable injury if an injunction does not issue.  In contrast, DriveTime has no right to continue its illicit bribery scheme and will not be harmed by an injunction.  Nor will injunctive relief disserve the public interest.

## VI.
### PRAYER

Plaintiff CarMax, Inc. asks that it be awarded a judgment against Defendant DriveTime, Inc. for the following:

a.    Actual damages;

b.    Restitution;

c.    Treble damages pursuant to RICO and all applicable state statutes;

d.    Exemplary and punitive damages;

e.    Costs of court;

f.    Attorneys' fees;

701499936v1

g.      A permanent injunction prohibiting DriveTime from further unlawful activity; and

h.      All other relief, at law or in equity to which Plaintiff is entitled.

Respectfully submitted,


/s/ Claudia Wilson Frost
Claudia Wilson Frost
State Bar No. 21671300
909 Fannin, Suite 2000
Houston, Texas 77010
(713) 276-7600
(713) 276-7673 (facsimile)
Claudia.Frost@pillsburylaw.com

**ATTORNEY FOR PLAINTIFF,**
**CARMAX AUTO SUPERSTORES, INC.**

OF COUNSEL:

Jeremy J. Gaston
State Bar No. 24012685
Christopher J. Richart
State Bar No. 24033119
PILLSBURY WINTHROP SHAW PITTMAN LLP
909 Fannin, Suite 2000
Houston, Texas 77010
(713) 276-7600
(713) 276-7673 (facsimile)
Jeremy.Gaston@pillsburylaw.com
Chris.Richart@pillsburylaw.com

Roxane A. Polidora
California State Bar No. 135972
PILLSBURY WINTHROP SHAW PITTMAN LLP
50 Fremont Street
San Francisco, CA 94105
(415) 983-1000
(415) 983-1200 (facsimile)
Roxane.Polidora@pillsburylaw.com

Robert M. Parker
State Bar No. 15498000
Robert Christopher Bunt
State Bar No.  00787165
Charles Ainsworth
State Bar No. 00783521
Andrew T. Gorham
State Bar No. 24012715
PARKER, BUNT & AINSWORTH, P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
(903) 531-3535
(903) 533-9687 (facsimile)
E-mail: rmparker@pbatyler.com
E-mail: rcbunt@pbatyler.com
E-mail: charley@pbatyler.com
E-mail: tgorham@pbatyler.com